UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ATLANTIC RECORDING CORPORATION,

               Plaintiff,

-against-

BCD MUSIC GROUP, INC. and MIXTRAP, LLC

               Defendants.
--------------------------------------------------------------X

08 Civ. 5201 (WHP)

**BCD RESPONSE
DECLARATION OF
HARALD BLAKESLEE**

HARALD BLAKESLEE, being duly sworn, deposes and says:

    1.    I am the managing director of the named Defendant, BCD MUSIC GROUP, Inc. ("BCD") an independent record distributor located in Kingwood, Texas, a suburb of Houston. I am responsible for general supervision of all of the day to day activities of BCD. BCD has no affiliation with named defendant, Mixtrap, LLC

    2.    BCD is a reputable independent record distributor which contractually licenses the rights to distribute and sell finished master sound recordings from third parties. BCD has over 500 titles in its catalog ranging from urban, to rock and alternative, to classical, to country, to comedy, and to children's titles. BCD is engaged in the distribution of legitimate sound recordings, has an excellent reputation in the independent record marketplace and is well-respected in the world of independent record retail.

    3.    Although BCD legitimately believed that it had proper authorization to distribute the "Real Definitions" mixtape album featuring the artist Plies, promptly after receiving the cease and desist letter from Atlantic, BCD took steps to remedy the situation. Prior to commencement of this action BCD advised Atlantic and its counsel that it had taken corrective action, had stopped selling "Real Definitions", had notified its vendors to stop selling it, and had deactivated the listing

for it on the BCD website – and that BCD wished to cooperate with Atlantic and resolve the dispute without the need for this litigation.

4.    Promptly after being advised that Atlantic also disputes BCD's right to distribute the mixtape album of Gucci Manes entitled "No Pad No Pencil" (although BCD never received any cease and desist correspondence prior to this action being commenced), BCD took corrective action and, despite BCD's legitimate business belief that it had proper authorization, stopped selling "No Pad No Pencil", notified its vendors to stop selling it, and deactivated the listing for it on the BCD website.

5.    Contrary to the false assertions of Plaintiff, BCD has not acted in bad faith, and is not a willful, "serial" or "egregious" infringer. BCD has at all times acted in good faith and has taken all steps it believed necessary, including procurement of a signing contract and verbal approval from employees in Warner's marketing department, to conduct its business legally.

6.    Although it is an unfortunate fact of life that, during the normal course of any business enterprise, it may, from time to time, be ensnared in legal actions, BCD's lawsuits with other major record labels which are mentioned by plaintiff are not relevant to this case – each has different underlying factual circumstances and involves different legal claims.

7.    In fact, it is almost certain that plaintiff, Atlantic Records, has been embroiled in far more copyright infringement claims against it than have ever been brought against BCD.

8.    Under the circumstances, it would seem that the only ones acting in bad faith are plaintiff and its counsel by proceeding with this action on an expedited basis when it had been advised that all of the corrective action it seeks by this preliminary injunction was complied with by BCD prior to filing and service of the Order to Show Cause and, therefore, any alleged threat of "irreparable harm" has been eliminated.

## *How the Record Business Marketplace Works*

9.     Four "major" record company distributors, Universal Music Group, EMI/Capitol, SONY/BMG and Warner Music (of which plaintiff, Atlantic Records, is a subsidiary) generally control the marketplace for recorded music in a near monopolistic fashion.

10.     Despite the ongoing efforts of these major record labels to control the marketplace and eliminate the smaller independent competitors, there is still a small, niche market in which independent distributors, such as BCD, thrive and survive.

## *How the Mixtape Marketplace Works*

11.     BCD sometimes distributes what are commonly known in the record industry as "mixtapes" which are usually sold in small quantities prior to the formal release by a major record company of a hip-hop recording artist's studio-made album. Both of the sound recordings at issue in this case are mixtapes.

12.     The mixtape format has become increasingly popular as a way of generating awareness and publicity for urban hip-hop artists. An unsigned artist might release several mixtapes to generate a grassroots groundswell of interest (or what is know in the industry as a "buzz"), leading to interest in that artist from the major record labels. An artist already signed to a major record label might release a mixtape album with full knowledge and support of the major label to promote a future studio album, relying on word of mouth about that mixtape to increase the artist's credibility (or "street cred") with the artist's fans. The personnel in the marketing and promotion departments of the major record labels often encourage this behavior while the label executives and legal department look the other way since it benefits the artist's public profile and leads to increased awareness and, therefore, increased sales of the forthcoming studio album and increased revenues for the major record companies. That is precisely what happened in this case.

13.    Often each individual song recorded (referred to individually as a "track") on a promotional hip-hop mixtape will feature a particular artist and contain numerous collaborations, remixes, freestyles and voice-overs, often arranged in a specific flowing fashion by a particular remix DJ (who may also add verbal flourishes or "shout outs" between and during the various tracks naming the artist and maybe even its record label so the artist's fans build awareness of the forthcoming studio album). Most hip-hop mixtapes are professionally packaged with a pressed CD and artwork, Hip-hop mixtapes are usually given out at the artist's live shows, or sold on the street, through independent record dealers or by mail order. Many mixtapes are also sold or given away for free in Mp3 format over the internet.

14.    In a recent documentary film entitled "Mixtape, Inc." the filmmakers attempted to show the importance of the practice and how it relates to the growing popularity of this music genre. Hip-hop mixtapes have been instrumental in supplementing the marketing and promotional endeavors of the major record labels, and are generally utilized by major recording acts with the implicit support of their major record labels. It is my understanding that in some cases there are even provisions in an artist's recording contract that acknowledge and permit such activities.

**_BCD's Good Faith Actions In Connection with Plies mixtape album "Real Definitions"_**

15.    In connection with the Plies mixtape album entitled "Real Definitions", on or about February 1, 2008 BCD entered into an agreement with Jeff Sledge, a 20-year veteran of the record industry, which BCD was induced to believe legitimately granted it the rights to distribute the mixtape album. Since mixtapes have a short lifespan and usually sell far fewer copies than a major label studio recording, the $6,000.00 paid by BCD under the agreement seemed a reasonable amount for an acceptable risk, and Sledge indicated that he was authorized by the respective artists and labels to allow BCD to release the mixtape recordings into the mixtape marketplace.

*4*

16.     A copy of the agreement with Jeff Sledge entitled "Addendum To Standard Terms & Conditions of Distribution" is attached as "**Exhibit A**"; BCD's "Standard Terms & Conditions" agreement is attached as "**Exhibit B**".

17.     BCD also relied on the "RepliCheck" software system provided by the Audible Magic corporation (www.audiblemagic.com). RepliCheck is a copyright identification service that represents that it can reduce the risk of replicating pirated CD content by quickly scanning a CD for copyrighted music then accurately identifying any conflicting works. ReplicCheck did not identify any conflicting works for BCD in connection with the Plies mixtape. Based on this fact BCD relies on the same technology that duplication houses rely upon so as not to commit copyright infringement.

18.     As a music distributor BCD cannot reasonably be expected to listen to every track on every CD, or even know every song on every CD, so BCD had no knowledge of any mention of "Atlantic" embodied in the sound recording itself. Any such reference to the artist's record label would presumably be so the artist can let his fans know where they can get the forthcoming studio album, which is the whole value of the mixtape as a promotional tool

19.     BCD had a legitimate business belief that it also had the authority to use the name and likeness of the artist Plies in connection with the Plies mixtape recording (only BCD's name, not Atlantic's name, appears on BCD's advertising and packaging of the mixtape). Contrary to plaintiff's false assertions, BCD did not falsely suggest that Atlantic endorsed the distribution and sale of the Plies mixtape album nor did BCD attempt to pass off the mixtape as being sponsored by Atlantic

20.     Although BCD entered into an agreement which it believed legitimately granted it the rights to distribute the album, and received what it thought was verbal approval from an

5

employee of Warner Bros. (as it had done in the past with at least one other artist on the label), promptly after receiving the initial cease and desist letter from Atlantic, BCD took immediate steps to remedy the situation. I scanned the letter to circulate to the BCD staff, a snap of which is attached as "**Exhibit C**". I sent it to Lauren Weiner at BCD who tracks contractual issues, and to Shila Mitra who is the authority on BCD releases. I assumed that they received it and would stop the process although it was subsequently discovered that BCD was having a problem with its email system. BCD's IT person worked on the problem for several days. When it was discovered that my initial scan had not been received BCD took immediate steps to remedy the situation.

21.    Prior to commencement of this action BCD advised Atlantic and its counsel that it had taken corrective action, had stopped selling "Real Definitions", and that BCD wished to cooperate with Atlantic and resolve the dispute without the need for this litigation.

### BCD's Good Faith Actions In Connection with Gucci Mane mixtape "No Pad No Pencil"

22.    In connection with the Gucci Mane mixtape album entitled "No Pad No Pencil", on or about February 1, 2008 BCD entered into the agreement with Jeff Sledge which it was induced to believe legitimately granted BCD the rights to distribute the mixtape album.

23.    BCD also relied on the "RepliCheck" software system which did not identify any conflicting works for BCD in connection with the Gucci Mane mixtape.

24.    BCD had a legitimate business belief that it had the authority to use the name and likeness of the artist Gucci Mane in connection with the Gucci Mane mixtape recording (only BCD's name, not Atlantic's name, appears on BCD's advertising and packaging of the mixtape). Contrary to plaintiff's false assertions, BCD did not falsely suggest that Atlantic endorsed the distribution and sale of the Gucci Mane mixtape album nor did BCD attempt to pass off the mixtape as being sponsored by Atlantic.

*6*

**25.** Promptly after being advised that Atlantic also disputed BCD's right to distribute the mixtape album of Gucci Manes entitled "No Pad No Pencil" (although BCD never received any cease and desist notice prior to commencement of this action), BCD took corrective action and, despite BCD's legitimate business belief that it had properly acquired the rights, stopped selling "No Pad No Pencil", notified its vendors to stop selling it, and deactivated the listing for it on the BCD website. Both the Plies and Gucci Mane mixtapes were inactive on BCD's website. See, "**Exhibit D.**" All of this was done prior service of the Order to Show Cause in this action.

### BCD's Good Faith Actions In Connection with the Order to Show Cause

26. BCD is a reputable independent record distributor which is well respected in the independent record marketplace. BCD acted in good faith with respect to the "Real Definitions" and "No Pad No Pencil" mixtapes which are the subject of this action, and took appropriate corrective action – prior to service of the Order to Show Cause - when given notice that BCD's contractual rights might conflict with those of plaintiff, Atlantic Records, a conflict which it expects to resolve in the course of this action.

27. Contrary to the false assertions of plaintiff, BCD does not have any other titles by Plies or Gucci Mane in its catalog which it offers for distribution.

28. In addition, BCD has engaged legal counsel to work with it more closely going forward in connection with negotiating and vetting all future contractual matters thoroughly in order to assure that BCD follows proper record business protocol and procures all of the necessary legal consents in order to engage in its record distribution business and avoid any further legal disputes such as this action.

29.     BCD expects to resolve this dispute with Atlantic Records promptly so that both parties can get back to focusing on the business of selling music in a difficult marketplace. However, BCD believes that many of the claims made by Atlantic in its Complaint are patently false and without merit, all of which will be addressed in due course.

30.     Since BCD has, in effect, complied with all of the requests sought by the Order to Show Cause, there is no threat of any "irreparable harm" and, therefore, no further basis for any expedited proceedings.

31.     Accordingly, BCD requests that a reasonable schedule be established so that its legal counsel can have the opportunity to fairly respond to plaintiff's allegations and fully brief the issues in response to plaintiff's claims before the discovery process is begun by both sides on an even footing.

I declare under penalty of perjury that the foregoing is true and correct.

June 9, 2008

Harald Blakeslee

8

"<u>EXHIBIT A</u>"

# ADDENDUM TO STANDARD TERMS & CONDITIONS OF DISTRIBUTION

This Addendum is entered into this **1** day of **feb** ~~2007~~ *2008* between Jeff Sledge (hereinafter "Label") and BCD Music Group, Inc (hereinafter "BCD"). The parties hereto accept BCD's Terms & Conditions of Distribution and further agree as follows:

**Label hereby:**

1. Agrees to deliver eight (8) albums:

   | | Artist | Title |
   |---|---|---|
   | a. | | *Delete* |
   | ~~b.~~ | ~~DJ S & S~~ | ~~Fat Boy Radio~~ |
   | c. | PLIES | DEFINITION OF REAL |
   | d. | BIRDMAN 7 LIL WAYNE | HAPPY FATHERS DAY |
   | e. | LIL BOOSIE | BOOSIEANNA |
   | f. | BIG MIKE | INTERNATION GANGSTER |
   | g. | GUCCI MANE | NO PAD NO PENCIL |
   | h. | THE EMPIRE | SOUTHERN SLANG 9 |
   | i. | RICK ROSS | CAROL CITY'S KING |

2. Grants a worldwide exclusively irrevocably license to BCD forever for distribution and sale (digital and physical) on any media currently known or invented in the future
3. Authorizes BCD to use the likeness of all artist(s) included on any recorded media.
4. Indemnifies and holds BCD harmless against future claims, damages and attorney's fees in the event any claims are made against BCD
5. Represents and Warrants that the music herein is free and clear and unencumbered, has no outstanding claims, and that master recordings were made as a "work for hire".
6. Shall provide additional releases, clearances and statements of authenticity if so requested by BCD.
7. Represents that no future royalties or payments of any kind are due to Label, other than specified herein
8. Acknowledges that Label understands that making representations that are not true and correct may be a criminal offense prosecutable under Federal and State laws.
9. Agrees to be available as may reasonably be requested by BCD to assist in specific promotions.
10. Agrees that BCD has and will have information regarding it's vendors, it's customers and it's artists and record labels, systems and other vital information (collectively, "Information") which are valuable, special and unique assets of the Company. You agree that you will not at any time or in any manner, either directly or indirectly, divulge, disclose, or communicate any Information to any third party without the prior written consent of the Company. You will protect the Information and treat it as strictly confidential.

**BCD shall:**

1. pay to Label a onetime payment of Six Thousand dollars ($6,000) at time of execution of this Agreement.

If there is a conflict between BCD's Term and Conditions of Distribution and this Addendum, this Addendum prevails.

Agreed:

_____
BCD Music Group, Inc

JEFFREY SLEDGE

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
### Identification Number and Certification

Give form to the requester. Do not send to the IRS.

Print or type
See Specific Instructions on page 2.

Name
*Jeffrey Sledge*

Business name, if different from above
*FERRIS AVE ENTERTAINMENT*

Check appropriate box: ☐ Individual/ Sole proprietor  ☑ Corporation  ☐ Partnership  ☐ Other ▶ .............    ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
*16 N. BROADWAY, Apt F6,*

Requester's name and address (optional)

City, state, and ZIP code
*White Plains, NY 10601*

List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

**Note:** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Social security number
*0 5 7 | 8 6 | 4 5 7 8 1*

or

Employer identification number

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here  Signature of U.S. person ▶ *Jeffrey Sledge*    Date ▶ *2/4/08*

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note:** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Cat. No. 10231X    Form **W-9** (Rev. 1-2003)

"<u>EXHIBIT B</u>"

### Terms & Conditions for Distribution

1. **Parties:** These are the terms and conditions under which we will distribute your audio or video ("Product(s)"). This agreement ("Agreement") is entered into on the date we receive the Submissions Forms and/or your product. This Agreement is between you ("Vendor") and BCD Music Group, Inc. ("Distributor").

2. **Term:** The term of this Agreement shall continue for an initial term of twenty-four (24) months ("Term"). Upon the expiration of the initial Term, the Term shall automatically be extended for successive one (1) year terms until terminated by either you or us. Termination requires thirty (30) days prior written notice to the other party before the end of the Term.

3. **Product Name and Artist:** This Agreement specifies the terms by which Distributor shall distribute your Product(s). The specific titles, Distributor's cost, and volume of the Product shall be dictated by demand or shall be determined by mutual agreement of the parties and by purchase orders issued by Distributor to Vendor.

4. **Product(s), Contact and Payee Information:** Vendor information shall be provided by Vendor in the Submission Forms. Vendor is responsible for informing Distributor of current contact information. For Vendor's protection, Distributor shall only issue information regarding this account to the Vendor Contact written in the Submission Forms. Vendor may change the contact by notifying Distributor in writing.

5. **Vendor's Right to Distribute:** Distributor shall have the **exclusive right** to distribute Vendor's Product; 1) through any digital medium now known or hereafter invented including, without limitation, the Internet, mobile telecommunications networks or satellite networks and Vendor hereby grants Distributor any and all licenses reasonably necessary to achieve the same, including the right to sublicense third parties as reasonably necessary; and 2) to any reseller in the world for the Term of this Agreement. Distributor shall solicit Vendor's Product to appropriate resellers. All final decisions relating to the acceptance or placement of Vendor's Product into a particular retailer's store, however, are at the sole discretion of that retailer. Distributor shall recommend to retailers the best markets to place Vendor's Product. Distributor does not guarantee placement of Vendor's Product into any particular retailer's store. Distributor shall be given the "1st Right of Refusal" to distribute Vendor's future audio and video content. Distributor must accept such new audio and video content within ten (10) business days after receipt.

6. **Vendor Communications to Retailers Exclusively Through Distributor:** All issues regarding distribution of Product, payment for Product distributed, returns of Product, or similar issues are to be addressed by Vendor to Distributor. Vendor shall NOT contact retailers directly regarding these or similar issues as to Products distributed by Distributor. Violation of this provision is grounds for immediate termination of this Agreement by Distributor (notwithstanding paragraph 2) and liquidated damages of $5,000. With Distributor's permission, Vendor may contact retailers directly for the limited purpose of promoting Vendor's Product and supplying related promotional materials. Distributor agrees to handle all of the complaints of its customers. The Distributor agrees to make every reasonable effort to satisfy its customers. The Distributor shall report to the Vendor all complaints which it is unable to resolve promptly.

7. **Payment to Vendor:** (a) Unless otherwise stated in the terms of a purchase order or addendum to these Terms issued by Distributor, Distributor shall pay vendor **70% of Distributor's selling price** for all units shipped, but in no event shall Distributor's earned amount per CD be less than $2.00. (b) Subject to the following, payment shall be made for each unit (1) the retailer has sold, (2) Distributor has collected payment, (3) Distributor does not have good cause to believe Product shall be returned. Distributor shall issue monthly reports and shall include any payment due with these reports, subject to Vendor's sales being one hundred (100) units or more per month. Otherwise reports shall be provided quarterly. These reports and payments if due shall commence in not more than ninety (90) days from the initial distribution of Product by Distributor. (c) In retail accounts, Distributor shall retain a reserve of not less than then twenty (20) percent against the amount due in the current quarter and for thirty (30) days following each period until such time Distributor decides that a reserve is no longer necessary or this Agreement is terminated and the account settled. (d) Distributor shall only issue payments when it owes Vendor $100 or more. Payments of less than $100 shall be made upon termination and settlement of account. (e) Neither this Agreement nor Distributor

shall guarantee actual sales of Vendor's Product, and other than described herein Distributor is not responsible for the number of actual sales of Vendor's Product. The number of units shipped by Vendor to Distributor does not indicate the number of actual sales. Distributor shall not accept Soundscan as an accurate representation of sales.

8.    **Payment to Distributor:** Vendor shall pay Distributor on execution of this Agreement two hundred fifty dollars ($250.00) to setup each title. Any marketing, promotions, selling or other services requested by Vendor shall be by separate agreement. Any payments made by Distributor to third parties at the request of the Vendor shall be subject to a twenty percent (20%) administrative charge. Monies due to Distributor shall be paid to Distributor from first sales of Product, or immediately by Vendor if so requested by Distributor.

9.    **Reports:** Distributor shall provide information if so available in a monthly report (or quarterly if sales of Product are less than one hundred (100) units per month) that details sales, inventory counts, and product placement.

10.   **Free Goods:** Vendor shall credit to Distributor two (2) units out of every thirty (30) units shipped to or manufactured by Vendor consigned as "Free Goods." These units shall be accounted for as "Free Goods" and physically identified as "Free Goods" by Vendor. Distributor shall use "Free Goods" in soliciting Vendor's Product to prospective buyers.

11.   **Shipment:** (a) Distributor shall issue purchase orders for Product as agreed between the parties. Distributor shall only accept shipments from Vendor that are accompanied to such a purchase order. Distributor shall accept only the quantity of product designated in the purchase order. (b) From time to time Distributor may agree to drop-ship to retail locations for the good of the Vendor but only upon retail store's specific request, or Vendor's request. Any such 'drop-ship' charges shall be billed back to Vendor's account and shall be reimbursed by Vendor to Distributor. Drop-ship charges per shipment are: $25.00 plus $0.50 per unit for 5 day Ground, or $40.00 plus $1.00 per unit for overnight delivery.

12.   **Defective Product:** Distributor shall not pay Vendor for any defective Product received from Vendor. Distributor shall inform Vendor of receipt of defective Product and shall return defective Product to Vendor for verification and credit. All returns shall be shipped at Vendor's expense at normal ground rate. If Vendor does not reply to a notice of a receipt of defective Product within thirty (30) days, Distributor may destroy the defective Product.

13.   **Excess Product and Product Recall:** Distributor shall return to Vendor excess Product. Excess Product is any amount of Product beyond what Distributor determines to be sufficient to fulfill orders from physical retail and Internet destinations. In the event Product sales are ten (10) units or less per month for six (6) consecutive months, Distributor may recall the Product, terminate this Agreement and return all unsold Product to Vendor. In the event Vendor chooses to recall Product or retail stores return the Product for whatever reason, Vendor shall pay Distributor one dollar ($1) for every Product returned to Vendor to cover additional shipping charges incurred by Distributor. In the event any Product is returned from Distributor to Vendor, Vendor shall pay for all shipping and related charges. At Distributor's request, Vendor shall make this payment prior to shipment. It is Vendor's responsibility to notify Distributor of current contact and payee information. From the date of recall it may take nine (9) months or more to return unsold units to Vendor. If after forty five (45) days following termination of this Agreement Distributor is unable to reach Vendor, or Vendor refuses shipments made to Vendor, Distributor may dispose of excess or recalled Product at its completed discretion.

14.   **Product Placement and Promotions:** Distributor often uses special Product promotions such as pricing and positioning, special display, listening station, in-store play, cooperative advertising and other promotions to promote vendors titles. In the event of such promotions of Vendor's Product, Distributor shall charge Vendor for amounts paid for such promotions.

15.   **Retail Discount:** In the event that Distributor offers customers a discounted price, Vendor agrees to reduce Distributor's Cost by a discount of up to fifteen percent (15%). This applies to volume discounts and early payment discounts offered to customers who commit to pre-sale buys and early payments.

16.   **Retail Price:** Distributor shall notify its retailers of Vendor's suggested retail price. Vendor acknowledges that Distributor does not control the retailers' actual retail price of Vendor's Product.

17.   **Duplication and Repackaging:** In the event Distributor requires more Product, which Vendor cannot or chooses not to supply as requested by Distributor,

Distributor shall hereby be authorized by Vendor to duplicate (press) any quantities of said Product as Distributor may deem reasonable to fill demand by customers. Such pressing costs shall be charged back to Vendor. If Distributor is required to repackage Vendor's Product (recycling of returns from retail, etc.), Vendor shall pay per unit $0.25 for shrink-wrap and $0.25 for jewel boxes as necessary. Vendor can choose to replace damaged product with salable product as an alternative to repackaging.

18. **Vendor's Representation and Warranty:**  Vendor represents and warrants that (a) Vendor has valid legal title to all copies of the subject title(s) and ownership interest including but not limited to copyright ownership and right to exploit names, images, and likeness of all talents listed or associated with said Project; (b) Vendor's offer or delivery of these copies and Distributor's distribution of these copies shall not violate any contract Vendor is bound by or any applicable law or regulation; and (c) distribution of these copies shall not violate or misappropriate any copyright or other intellectual property rights of any third party. Vendor shall indemnify and hold Distributor harmless from all claims, damages, and expenses (including, without limitation, attorney fees) arising from Vendor's breach of these representations and warranties. Vendor shall use its best effort to market and promote its Product and Artist, and undertake promotions as may reasonably be requested by Distributor.

19. **Choice of Law and Jurisdiction:**  The laws of the United States of America and the State of Texas govern this Agreement. Any action related to this Agreement must be brought in the federal or state courts in Texas. Vendor consents to the jurisdiction of these courts.

20. **Licensing for Promotional Use of Sound Clips, Artist Likeness, Artwork:** Vendor has the right and hereby grants Distributor the right to use individual tracks or sound clips of recordings, making compilations, using artist likeness and photographs, artwork, and other similar items supplied by Vendor or obtained from public domain (Promotional items) to promote the artist over the Internet, at retail locations, to other distributors or to consumers. By supplying these items to Distributor and consumers, Vendor warrants that Vendor owns and possesses the necessary rights to assign to and allow Distributor to use such items in appropriate marketing and sales applications.

21. **Entire Agreement:**  This document represents the entire Agreement by these parties. There are no promises, terms, conditions, or obligations other than those contained in this document. This written contract supersedes all prior communications, representations, or agreements, either verbal or written, between the parties. Agreements by Vendor with third parties do not have any bearing on this Agreement and do not affect the obligations or liabilities of Distributor. Distributor has attempted to make this document consistent with all other informational materials and shall publish this document on the Internet. To the extent that there are inconsistencies, however, this document controls.

By submitting Product to Distributor for distribution you agree to the terms and conditions set forth herein.

**Distributor's Mailing Address:**
BCD Music Group, Inc., 1621 Lakeville Dr., Kingwood, Texas 77339
**Warehouse Address:**
1619 Lakeville Dr., Kingwood, Texas 77339

3

"**<u>EXHIBIT C</u>**"

Gmail - SNAP.jpg





"**EXHIBIT D**"



**CATALOG SEARCH**

BCD Music Group • Kingwood, TX 77339 • TEL 281 260-7777 • FAX 281 348-0848    QUERY

## BCD Music Group Catalog
### June 06, 2008

artist=plies  release_date=( )( )  contract_date=( )( )

**Real Definitions**
*Artist: Plies*

INACTIVE TITLE

This Fort Myers-based rapper has already established a phenomenal underground and street presence on the strength of his infamous mixtapes and live shows. Plies is simply a real-life block hugger who happened to learn how to tell his story in rhyme. With a molasses-thick dirty south accent and a gang of stress on his chest, Plies rips it over neck-snapping tracks in Real Definitions.



686506316724
1CD
Release Date: 4/1/08
Contract Date: 02/01/2008
Suggested Retail: 14.99
Box Quantity: 30

*Starz Music*
DN63167
rap
15 tracks ◀    1-sheet

**PARENTAL ADVISORY**
**EXPLICIT CONTENT**

1


# CATALOG SEARCH

BCD Music Group • Kingwood, TX 77339 • TEL 281 260-7777 • FAX 281 348-0848    QUERY

## BCD Music Group Catalog
### June 06, 2008

artist=gucc  release_date=()()  contract_date=()()

**No Pad No Pencil**
*Artist:* **Gucci Mane**

INACTIVE TITLE

Successful hip-hop is about the hint of the danger, the tease of it, and the mystique. Hip-hop is also about balance, volatility versus musicality. Gucci presents an unmistakable presence on the mic, one of the best flows in rap and, most importantly, an innate sense for crafting great hooks. Using no pad, no pencil, he speaks his own words with flair and style.



*Starz Music*
DN63166
rap
18 tracks ◄    1-sheet

PARENTAL
ADVISORY
EXPLICIT CONTENT

686506316625
1CD
Release Date: 4/1/08
Contract Date: 02/01/2008
Suggested Retail: 14.99
Box Quantity: 30

1

"**<u>EXHIBIT E</u>**"

### dd@bcdmg.com

**From:** Jullian Boothe [jullianboothe@gmail.com]
**Sent:** Monday, June 02, 2008 1:50 PM
**To:** dd@bcdmg.com
**Subject:** Re:

you have the agreement for the artist to sign off, so I can use what you guys need.

Thanks

On Mon, Jun 2, 2008 at 11:00 AM, <dd@bcdmg.com> wrote:

> You are seeking royalty payments correct?
>
> ---
>
> **From:** Jullian Boothe [mailto:jullianboothe@gmail.com]
> **Sent:** Monday, June 02, 2008 12:52 PM
> **To:** Derrick Diggs
> **Subject:**
>
>
> Send the agreements you guy have that you feel comfortable with so I can get everything signed off
> and their won't be any hold up's
>
> --
> JULLIAN BOOTHE
> VP of A&R for Slip n Slide Records
> 919 4th Street
> Miami Beach, Fl 33139
> 305 535 7595 Office
> 395 535 1535 Fax
>
> Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.

--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

6/3/2008

**dd@bcdmg.com**

**From:** Jullian Boothe [jullianboothe@gmail.com]

**Sent:** Monday, June 02, 2008 12:52 PM

**To:** Derrick Diggs

Send the agreements you guy have that you feel comfortable with so I can get everything signed off and their won't be any hold up's

--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.

6/3/2008

**dd@bcdmg.com**

**From:** Jullian Boothe [jullianboothe@gmail.com]
**Sent:** Monday, June 02, 2008 12:53 PM
**To:** Derrick Diggs

And let's see if we can do 15k per cd.

--
JULLIAN BOOTHE

## dd@bcdmg.com

**From:**    Jullian Boothe [jullianboothe@gmail.com]
**Sent:**    Thursday, May 29, 2008 4:48 PM
**To:**    dd@bcdmg.com
**Subject:** Re: checking in

Got a Trina and Jim Jones...send out today

On Thu, May 29, 2008 at 2:46 PM, <dd@bcdmg.com> wrote:
> Ok. Let"s get something that will get no haters. Major labels.
> Sent from my Verizon Wireless BlackBerry
>
> -----Original Message-----
> From: "Jullian Boothe" <jullianboothe@gmail.com>
>
> Date: Thu, 29 May 2008 14:03:26
> To:dd@bcdmg.com
> Subject: Re: checking in
>
>
> I'm send you 2 projects I got in the works...we gotta make these happen.
>
>
>
> On Thu, May 29, 2008 at 2:01 PM, <dd@bcdmg.com <mailto:dd@bcdmg.com> > wrote:
> When u ready. You know what we need bro
> Sent from my Verizon Wireless BlackBerry
>
>
>
>
> -----Original Message-----
> From: "Jullian Boothe" <jullianboothe@gmail.com <mailto:jullianboothe@gmail.com> >
>
> Date: Thu, 29 May 2008 13:49:43
> To:"Derrick Diggs" <dd@bcdmg.net <mailto:dd@bcdmg.net> >
> Subject: checking in
>
>
> What up brother....can we get something in the works.
>
>
> --
> JULLIAN BOOTHE
> VP of A&R for Slip n Slide Records
> 919 4th Street
> Miami Beach, Fl 33139
> 305 535 7595 Office
> 395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.


--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.


--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.

6/3/2008

**dd@bcdmg.com**

---

**From:**  Jullian Boothe [jullianboothe@gmail.com]
**Sent:**  Thursday, May 29, 2008 4:03 PM
**To:**  dd@bcdmg.com
**Subject:** Re: checking in

I'm send you 2 projects I got in the works...we gotta make these happen.


On Thu, May 29, 2008 at 2:01 PM, <dd@bcdmg.com> wrote:
When u ready. You know what we need bro
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Jullian Boothe" <jullianboothe@gmail.com>

Date: Thu, 29 May 2008 13:49:43
To:"Derrick Diggs" <dd@bcdmg.net>
Subject: checking in


What up brother....can we get something in the works.

--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.



--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.

**dd@bcdmg.com**

| | |
|---|---|
| **From:** | Jullian Boothe [jullianboothe@gmail.com] |
| **Sent:** | Thursday, May 29, 2008 3:50 PM |
| **To:** | Derrick Diggs |
| **Subject:** | checking in |

What up brother....can we get something in the works.

--
JULLIAN BOOTHE
VP of A&R for Slip n Slide Records
919 4th Street
Miami Beach, Fl 33139
305 535 7595 Office
395 535 1535 Fax

Artists: Rick Ross, Plies, Trina, Qwote, Camar, Shonie.

**dd@bcdmg.com**

| | |
|---|---|
| **From:** | Jullian Andres Boothe Slip N Slide [mrjullian@gmail.com] |
| **Sent:** | Saturday, October 06, 2007 4:32 PM |
| **To:** | dd@bcdmg.net |
| **Subject:** | Call me |

Call me 786 344 4433


JULLIAN ANDRES' BOOTHE
VP OF A&R OF SLIP N SLIDE RECORDS

PLIES IN STORES NOW!!
TRINA 2.12.08
RICK ROSS 2008
TRICK DADDY 2008
DIRTBAG 2008

THIS IS A CONFIDENTIAL TRANSMISSION IF YOU READ U AGREE TO NOT DISCLOSE W/O SENDERS
PERMISSION

1

**FedEx** US Airbill
Express

FedEx Tracking Number: 8640 9694 1380

0200

**4a Express Package Service** — *Packages up to 150 lbs.*
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx First Overnight
- FedEx 2Day
- FedEx Express Saver

**4b Express Freight Service** — *Packages over 150 lbs.*
- FedEx 1Day Freight
- FedEx 2Day Freight
- FedEx 3Day Freight

**5 Packaging**
- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling**
- SATURDAY Delivery
- HOLD Weekday at FedEx Location
- HOLD Saturday at FedEx Location
- Does this shipment contain dangerous goods?
  - No
  - Yes
  - Dry Ice
  - Cargo Aircraft Only

**7 Payment** *Bill to:*
- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages   Total Weight   Total Declared Value

**8 Residential Delivery Signature Options**
- No Signature Required
- Direct Signature
- Indirect Signature

520

---

From
Date

Sender's Name

Company

Address

City     State     ZIP

Your Internal Billing Reference

To
Recipient's Name     Phone

Company

Recipient's Address

Address

City     State     ZIP

8640 9694 1380

---

**FedEx** US Airbill
Express

8640 9694 1380

0200     FedEx Retrieval Copy

**1 From**
Date Sp6o9     Sender's FedEx Account Number: 399508161

Sender's Name Julian Gentle

Company Sierra 9 1de Records

Address 917 4th Street

City West Beach     State TL     ZIP 33139

**2 Your Internal Billing Reference** — TeRRA

**3 To**
Recipient's Name Drake

Company Muse Corp

Recipient's Address 1631 Caksville Drive

Address

City Kingswood     State TY     ZIP 78230



8640 9694 1380

**4a Express Package Service** — *Packages up to 150 lbs.*
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx First Overnight
- FedEx 2Day
- FedEx Express Saver

**4b Express Freight Service** — *Packages over 150 lbs.*
- FedEx 1Day Freight
- FedEx 2Day Freight
- FedEx 3Day Freight

**5 Packaging**
- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling**
- SATURDAY Delivery
- HOLD Weekday at FedEx Location
- HOLD Saturday at FedEx Location
- Does this shipment contain dangerous goods?
  - No
  - Yes
  - Dry Ice
  - Cargo Aircraft Only

**7 Payment** *Bill to:*
- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages   Total Weight



**8 Residential Delivery Signature Options**
- No Signature Required
- Direct Signature
- Indirect Signature

520